**Dr. Stanley S. BARR and Bernard S. Levy, Individually and for all other persons similarly situated, Plaintiffs,**

v.

**WUI/TAS, INC., Defendant.**

**No. 74 Civ. 2687–LFM.**

United States District Court,
S. D. New York.

Feb. 26, 1975.

Haight, Gardner, Poor & Havens, New York City, for plaintiffs; Walter E. Rutherford and Robert B. Haserot, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for defendant; Alvin K. Hellerstein, Lawrence M. Handelsman and Bruce Rabb, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

Plaintiffs move for (1) an order pursuant to Rule 15(a), Fed.R.Civ.P., amending the complaint; (2) a determination under Rule 23(c), Fed.R.Civ. P., that this is a class action; and (3) an order pursuant to Rule 37, Fed.R. Civ.P., compelling defendant to produce certain documents. Defendant moves, pursuant to Rule 12(c), Fed.R.Civ.P., for judgment on the pleadings.

The complaint alleges that defendant operates telephone answering services

throughout the United States under various trade names and that the named plaintiffs have been subscribers to that service since January 1, 1970. Defendant bills its subscribers monthly on the basis of a fixed monthly rate for a stated number of message units processed by defendant for that customer, plus a per message unit rate for each message unit over the stated number.

The first claim for relief alleges a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs claim that since about January 1, 1970 defendant, by means of an unlawful combination and conspiracy in restraint of trade, fixed the prices charged for its telephone answering services. Defendant accomplished this, it is alleged, by arbitrarily increasing by at least 20% the number of message units billed monthly to each subscriber without informing the subscriber that he was being billed for message units never received. According to plaintiffs, this has resulted in the maintenance of arbitrary and artificial price levels and has deprived subscribers of the benefits of free competition. Plaintiffs seek to enjoin defendant from continuing this practice, treble damages, costs and attorney's fees.

The second claim for relief also arises out of the alleged 20% increase in message units billed to subscribers. Plaintiffs contend that this was, in effect, an illegal price increase, in violation of various Executive Orders and price control regulations in effect from August 1971 until April 1974, since defendant never received governmental approval for its increased rates. Plaintiffs seek treble damages, costs and attorney's fees on this claim.

Plaintiffs move under Rule 15(a) for leave to amend the complaint to state a third claim for relief. The proposed claim allegedly arises under the Organized Crime Control Act of 1970, 18 U.S.C. § 1961 et seq. Plaintiffs allege that defendant committed mail fraud by mailing bills containing message units for messages never actually received. This activity, it is claimed, constituted a pattern of racketeering, as defined by 18 U.S.C. § 1961, and income received from this activity was used in the operation and control of enterprises engaged in interstate commerce, as proscribed by 18 U.S.C. § 1962.

■ Defendant concedes that amendments are freely allowed under Rule 15(a) but opposes an amendment here on the ground that the proposed claim for relief is, on its face, without merit. We may, of course, deny leave to amend a complaint where "a party seeks to assert a claim that lacks merit."[1]

Defendant contends that the legislative history of the Organized Crime Control Act indicates that it was never intended to apply to a case such as this. We agree.

When read literally, the rather broad language of the Act appears to encompass the factual situation alleged in the complaint. It makes it unlawful for any person (including a corporation), who has received income from "a pattern of racketeering activity," to use it in the operation or control of an enterprise which is engaged in or affects interstate or foreign commerce. 18 U.S.C. § 1962. By definition, "racketeering activity" includes mail fraud, and a "pattern" of such activity consists of a minimum of two acts. 18 U.S.C. § 1961. Any person injured by reason of a violation of these sections may recover treble damages, as well as costs and attorney's fees. 18 U.S.C. § 1964.

The proposed amended complaint alleges that the mailing of the inflated

---

1. Friedman v. Chesapeake & O. Ry., 261 F. Supp. 728, 734 (S.D.N.Y.1966), aff'd, 395 F.2d 663 (2d Cir. 1968), cert. denied, 393 U.S. 1016, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969); Johnson v. Partrederiet Brovigtank, 202 F.Supp. 859, 867 (S.D.N.Y.1962); 3 J. Moore, Federal Practice para. 15.08 [4] (2d ed. 1974).

bills constituted a pattern of racketeering activity, *i. e.*, mail fraud, and that the income received from this activity was used to operate and control defendant which is engaged in interstate and foreign commerce. It does not allege, however, that defendant is anything but a perfectly legitimate business. There is nothing in the proposed complaint even to suggest that defendant is connected in any way with organized crime. On the contrary, plaintiffs allege that defendant is the largest telephone answering service in the United States, operating in all fifty states, and with revenues exceeding $17,000,000 per year.

■ An examination of the legislative history of the Act[2] convinces us that the Act was not intended to create a private right of action upon facts such as those alleged here. The legislative history makes frequent references to "racketeers," "organized crime" and "organized crime families," as well as the "syndicate," "Mafia" and "Cosa Nostra." It is clear that it was aimed not at legitimate business organizations but at combating "a society of criminals who seek to operate outside of the control of the American people and their governments."[3] There is no question that defendant cannot be so characterized.

■ Assuming that plaintiffs' allegations have merit, the most that can be said is that defendant's transactions, on this occasion, have been illegal. Defendant is not a member of a society of criminals operating outside of the law. The mere granting of leave to file a claim under this section would add credence to an inference that defendant is somehow involved in organized crime. This would not only be unfounded, in light of the information before us, but patently unfair.

Accordingly, we find plaintiff's proposed third claim for relief specious, frivolous and without merit and deny their motion for leave to amend.

■ Defendant moves, pursuant to Rule 12(c), for judgment on the pleadings dismissing the complaint. We exclude all matters outside the pleadings and treat this in the same manner as we would a motion pursuant to Rule 12(b)(6) to dismiss for failure to state a claim for relief.[4]

Defendant contends that both counts of the complaint are legally insufficient. The first claim, alleging a conspiracy to fix prices in violation of the Sherman Act, is defective, defendant argues, since it fails to name the alleged co-conspirators.

The complaint is far from a model pleading and does not specifically list the alleged co-conspirators. Read as a whole, however, we glean that plaintiffs allege in count one that defendant and a number of its subsidiaries are engaged in the business of providing telephone answering services throughout the United States and that defendant and its subsidiaries conspired to fix the prices of these services.

■■ It is well settled that a corporation may violate Section 1 of the Sherman Act by conspiring with its subsidiary corporations to fix prices.[5]

2. See H.R.Rep.No.91–1549, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News, 1970, p. 4007; Hearings on S. 30, S. 974, S. 975, S. 976, S. 1623, S. 1624, S. 1861, S. 2022, S. 2122 and S. 2292 Before the Subcomm. of the Senate Comm. on the Judiciary, 91st Cong., 1st Sess. (1969).

3. Statement of the Attorney General of the United States, Senate Hearings, *supra*, at 108.

4. See Rule 12(h)(2) and 5 C. Wright & A. Miller, Federal Practice and Procedure § 1367 (1969).

5. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, rehearing denied, 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1951); United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Minnesota Bearing Co. v. White Motor Corp., 470 F.2d 1323

We find that, in its obtuse way, count one states such a claim.

Count two of the complaint, alleging a violation of the Economic Stabilization Act of 1970, is also challenged by defendant. Defendant contends that a prerequisite to jurisdiction under this Act is a demand for a refund by the person aggrieved by an overcharge and a refusal of such a refund. Absent a demand and refusal, defendant contends, a claim exists only when the overcharge is willful. Defendant argues that the second count of the complaint is defective since it alleges neither a demand and refusal of a refund nor a willful overcharge.

Section 210 of the Economic Stabilization Act, 12 U.S.C. § 1904 (1975 Supp.), provides, in part:

"(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief . . .."

Subsection (b) provides, in substance, that an action against a person who has overcharged the plaintiff may be maintained if the plaintiff has presented a claim for refund to the seller and not received a refund within ninety days or if the overcharge is willful within the meaning of Section 208(a).

Section 208(a) reads:

"Whoever willfully violates any order or regulation under this title shall be fined not more than $5,000 for each violation."

There is no dispute that the complaint alleges neither a demand for a refund nor a refusal and, therefore, is insufficient in law unless it alleges a willful overcharge. Defendant contends that plaintiffs do not allege a willful overcharge since they do not allege "a specific intent to violate the economic stabilization laws." We disagree.

While it is true that "the term 'willful overcharge' must be construed in the criminal sense,"[6] this does not mean, as defendant suggests, that defendant must have specifically intended to violate this particular law or even that it must have been aware that its conduct was against the law. "Willful," when construed in the criminal sense, simply means that defendant must have known what it was doing, that it acted voluntarily, deliberately and on purpose, and not because of mistake, accident, carelessness or other innocent reason.

Paragraphs 5 and 7 of the complaint (incorporated by reference into the second claim for relief), as well as paragraph 28, allege that defendant willfully overcharged its customers. Paragraphs 31 and 33 allege that defendant illegally raised its prices. The pleading is, therefore, sufficient under Section 210 of the Act.

Plaintiffs move, pursuant to Rule 23(c), for class action determination, claiming that this action qualifies for class action status under Rule 23(a) and (b)(3). Defendant opposes class certification on two grounds. It contends that this action does not meet the requirements of Rule 23(b)(3) since (1) common questions of law and fact do not predominate over questions affecting individuals, and (2) a class action is not superior to other available methods for the fair and efficient adjudication of the controversy.

(8th Cir. 1973) ; Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953) ; Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453, 458 (W.D.Pa.1968) ; Balian Ice Cream Co. v. Arden Farms Co., 104 F.Supp. 796 (S.D. Cal.1952), aff'd, 231 F.2d 356 (9th Cir. 1955), cert. denied, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856 (1956).

6. Manning v. University of Notre Dame Du Lac, 484 F.2d 501, 503–504 (Temp. Emer. Ct. of App. 1973).

Defendant contends that its business is organized into six regional offices which are not, as plaintiffs claim, subsidiaries of defendant, but rather mere subdivisions. Defendant's sales manager, it contends, advised the manager of each regional office that he could increase the message units charged to certain customers to recapture revenue thought to be lost by poor record-keeping methods, but that each regional manager decided whether or not he would make the adjustment to the bills of customers he serviced. Some managers made the adjustments but others did not, defendant contends, and so the proof as to each region will be different, thus causing individual, rather than common, questions to predominate. We find this argument unpersuasive.

Plaintiffs claim that what defendant refers to as "regional offices" are, in fact, subsidiaries. This issue is in dispute, and we cannot accept defendant's version of the facts for the purpose of this motion, although it may ultimately prevail on this issue at trial. Plaintiffs must be given an opportunity to prove what they allege.

The common threads running through each class member's claim are whether defendant unlawfully conspired to restrain trade or willfully overcharged its customers. These questions clearly predominate over any individual questions. If, at trial, it becomes evident that the regional offices were not subsidiaries or that each had adopted a different policy as to its billing practices, this would still not cause individual questions to predominate. At most, it would require the class to be divided into six subdivisions so that the practices of each regional office or subsidiary could be separately assessed.

■ The only individual questions which we can foresee are whether each class member was damaged, and, if so, the amount of his damages. This, however, will not defeat class certification.[7] Proof of individual damages may, if necessary, be severed and treated in later proceedings.[8]

■ Moreover, an examination of the monthly time sheets of the named plaintiffs, submitted as exhibits in support of this motion, indicates that the determination of these individual issues will be relatively simple. These time sheets, kept by defendant presumably in the ordinary course of business, reflect the number of message units, if any, added to each individual's bill and greatly simplify the individual questions. Thus, we find that the common questions clearly predominate over the individual questions.

Defendant's second attack on class certification, that a class action is not superior to other available methods for the fair and efficient adjudication of the controversy, is equally unconvincing. Defendant contends that where a statute, such as Section 210 of the Economic Stabilization Act, guarantees a successful plaintiff a minimum recovery of $100 and entitles him to recover his attorney's fees (also true of the Sherman Act), class action status is inappropriate.

In support of its position, defendant relies principally upon Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972), and cases following it.[9]

---

7. Green v. Wolf Corp., 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); Cutner v. Fried, 373 F.Supp. 4 (S.D.N.Y.1974).

8. Cutner v. Fried, *supra*, 373 F.Supp. at 12; 3B J. Moore, Federal Practice para. 23.-45[2] at 23–762 (2d ed. 1969).

9. See Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973); Kriger v. European Health Spa, Inc., 56 F.R.D. 104 (E.D.Wisc.1972).

In *Ratner*, the court denied class certification in an action under the Truth in Lending Act of 1968, 15 U.S.C. § 1640(e), on the ground that a class action was not superior to other methods "for the fair and efficient adjudication of the controversy."[10] The court opined that since the Truth in Lending Act provides for a minimum recovery of $100 as well as attorney's fees to a successful plaintiff, the "incentive of class-action benefits is unnecessary" and "the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, for what is at most a technical and debatable violation of the Truth in Lending Act."[11] It is worth noting that the court did not rule that class action treatment is never appropriate for a claim under that Act, but rather specifically limited its holding to the particular facts of that case. There, plaintiffs suffered either no actual damages or merely nominal damages, and the putative class contained 130,000 members.

 *Ratner* is a far cry from the instant case, where plaintiffs allege far more than a "technical and debatable violation" of the law. Here, plaintiffs allege that defendant conspired to fix the price of its services and willfully overcharged its customers, causing actual damage to the class members. The class of 44,000 subscribers is also significantly smaller than the class in *Ratner*, and we are not convinced that the potential liability from the minimum $100 per class member recovery would be a "horrendous" or "annihilating" punishment to a corporation as large as defendant.

It would certainly be more desirable to concentrate this litigation in one action and in one forum, and it would be naive in the extreme to believe that the $100 minimum recovery would be sufficient incentive for all of the class members to prosecute individual actions, even recognizing that they will recover attorney's fees, if successful. Moreover, from defendant's viewpoint, it would be more costly if numerous individual actions were successfully prosecuted since defendant would then be liable for fees to a myriad of attorneys, each duplicating the other's work.

These reasons persuade us to allow this action to proceed as a class action. The class shall consist of all customers for telephone answering service of defendant and its subsidiaries (or regional offices) from January 1, 1970 to date. Plaintiffs are directed to give individual notice of this action to all members of the class who can be identified through reasonable effort. Notice by mail is the best method.

 The notice shall advise each class member that, if he so requests within two months from the receipt of notice, he will be excluded from the class; that the judgment, whether or not favorable to the class, shall bind all members who do not request exclusion; and that any member who does not request exclusion may appear through his counsel. The cost of such notice shall be borne by plaintiffs.[12]

The form of notice, as set forth in Katz v. Carte Blanche Corp., 53 F.R.D. 539 (W.D.Pa.1971), shall be submitted to the court for approval on or before March 24, 1975.

 Plaintiffs move, pursuant to Rule 37, for an order compelling defendant to produce documents and other items enumerated in items 1 through 5

10. Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 416 (S.D.N.Y.1972); Rule 23(b)(3).

11. Ratner v. Chemical Bank New York Trust Co., *supra*, 54 F.R.D. at 416.

12. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178–79, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

and 7 through 9 of plaintiffs' notice to produce. We find that all of these items may be relevant to the subject matter of this action, and we find defendants' objections to their production meritless. These items should, therefore, be produced.[13]

Accordingly, plaintiffs' motion for a class determination and plaintiffs' motion to compel production of certain documents are granted. Plaintiffs' motion to amend the complaint and defendants' motion for judgment on the pleadings are denied.

So ordered.

13. See First Nat'l City Bank v. Zammas, Docket No. 73 Civ. 3157 (S.D.N.Y. Jan. 22, 1975); Mallinckrodt Chem. Works v. Goldman, Sachs & Co., 16 Fed.Rules Serv.2d 1517 (S.D.N.Y.1973).